# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 02-3826/3919

_____

MidAmerican Energy Company,        \*
                                               \*

      Plaintiff - Appellant/        \*
      Cross Appellee,            \*

                                               \*  Appeals from the United States
      v.                             \*  District Court for the
                                               \*  Southern District of Iowa.
International Brotherhood of       \*
Electrical Workers Local 499,     \*

                                                 \*

      Defendant - Appellee/       \*
      Cross Appellant.          \*

_____

Submitted: June 12, 2003

Filed: September 26, 2003

_____

Before BOWMAN, MURPHY, and BYE, Circuit Judges.

_____

BOWMAN, Circuit Judge.

In this labor case, MidAmerican Energy Company challenges the District Court's decision not to set aside an arbitrator's award that required it to reinstate Ronald Turner, a fired employee. The International Brotherhood of Electrical Workers Local 499 (Union) seeks to enforce the award insofar as it requires Turner's reinstatement, but seeks to overturn the District Court's decision not to award Turner back pay. We affirm in part and reverse in part.

I.

MidAmerican operates a liquid natural gas storage facility in Waterloo, Iowa, that is capable of holding some ten million gallons of gas and that, at the time of the incident, held several million gallons of gas. On the night of June 1, 2001, Turner was the only employee at the facility and was responsible for the security of the facility and for monitoring the stability of the liquid natural gas on hand. Because he was the only employee on duty and because liquid natural gas is a volatile substance, he was not permitted to leave without being relieved. Shortly after midnight, Turner decided to leave work. He thereupon disabled nearly forty monitoring and safety devices (including fire warning and perimeter security systems) and left the premises in a company vehicle (he left his own car in its parking spot so that his absence would not be discovered). Turner does not dispute the fact that he disabled the safety and security systems and that he took the company vehicle in order to conceal his absence. Approximately a half-hour after Turner left, the plant manager received an anonymous telephone call about a company van being driven about town. The plant manager was unable to contact Turner at work and subsequently discovered Turner's absence when he went to the plant to investigate. Turner eventually returned to work at about three-thirty in the morning and was suspended on the spot and later fired. The parties agree that Turner's actions violated company rules and state and federal regulations and that, as a result of Turner's actions, MidAmerican was obliged to self-report the incident and was exposed to potential fines. Aside from the major dereliction of duty we have just described, Turner's work record was excellent.

After Turner was fired, he invoked the grievance procedures provided for in the collective bargaining agreement that governed his employment, and the Union represented him in the ensuing discussions and arbitration. MidAmerican refused to reinstate Turner because it maintained his termination was "for just cause," as provided for in the collective bargaining agreement. At the time his actions were

discovered, during the company's investigation, and at the arbitration hearing, Turner insisted that he left his post because he received a call from his wife, who informed him that his son was missing and had possibly been injured in gang activity. He insisted that he was very worried and left work to search for his son. His wife corroborated this claim at the arbitration hearing. Although the arbitrator did state that Turner's explanation was less than convincing, the arbitrator also stated that:

> I note that at no time has [Turner] not taken full responsibility for his actions. As the Local points out, he cooperated at all times with Management during the course of their investigation, and has consistently owned up to what he did, indicating that he knew it to be wrong.

Arbitrator's Award at 12 (Dec. 26, 2001). With that in mind, the arbitrator issued the following award:

> [w]hile [Turner's] actions constitute just cause for discipline, his lengthy and otherwise unblemished service with the Utility warrants a reduction in the most severe of workplace penalties (termination). Accordingly, Mr. Turner's discharge shall forthwith be reduced to a suspension without any back pay. Further, should Management determine that he can no longer occupy a position of trust such as he held on June 22nd of this year, they may disqualify him from that job and transfer him to another position in the bargaining unit where more direct supervision is available. Hopefully, [Turner] will have learned from this experience the importance of trust, and the need for adhering to the requirements of his job assignment—whatever they may be. Should that again prove not to be the case, however, then a more severe penalty may well be justified.

Id. at 13.

After the arbitrator issued his award, MidAmerican was notified by an anonymous caller that Turner might have lied about his reasons for leaving work on

the night in question. The caller also suggested that MidAmerican contact Carol Carey, whom the caller suggested might have information relating to Turner's whereabouts on the night in question. MidAmerican did contact Carey, who later testified in her deposition that she had been having an extramarital affair with Turner and that he was with her on the night of June 1.

Thereafter, MidAmerican filed the present suit to vacate the arbitrator's award. Both MidAmerican and the Union moved for summary judgment. MidAmerican urged that the award should be set aside under one of two narrow exceptions that permit a reviewing court to set aside arbitration rulings: public policy or fraud. For its part, the Union sought to have the award enforced and also sought back pay for the time between the issuance of the award and Turner's eventual reinstatement. The District Court entered summary judgment denying MidAmerican's motion to set aside the award, denying the Union's motion for back pay, and granting the Union's motion to enforce the decision. MidAmerican appeals this adverse ruling and seeks to vacate the award. The Union cross-appealed seeking back pay for Turner.

II.

We apply "ordinary, not special, standards when reviewing district court decisions upholding arbitration awards." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 948 (1995). Thus, we review a district court's findings of fact for clear error and conclusions of law de novo. Id. at 947–48. Our review of the District Court's decision to grant summary judgment is de novo. Gen. Trading Int'l, Inc. v. Wal-Mart Stores, Inc., 320 F.3d 831, 835 (8th Cir. 2003). We review the grant of summary judgment de novo even though the enforcement of an arbitration award is involved. Teamsters Local Union No. 42 v. Supervalu, Inc., 212 F.3d 59, 65 (1st Cir. 2000).

Judicial review of arbitration rulings is limited.  See United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 37–38 (1987).  Indeed, we have observed that "the decision of an arbitrator who has not exceeded his contractual authority is almost always upheld."  Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers, 834 F.2d 1424, 1427 (8th Cir. 1987).  In this case, MidAmerican argues that two possible grounds exist on which to vacate the arbitrator's award.  First, MidAmerican argues that the public policy exception repeatedly recognized by the Supreme Court is applicable to this case.  See E. Associated Coal Corp. v. United Mine Workers, 531 U.S. 57, 62–63 (2000).  Second, MidAmerican contends that the rule permitting a reviewing court to decline to enforce an arbitration award procured by fraud should apply here.  See 9 U.S.C. § 10(a)(1) (2000); Goff v. Dakota, Minn. & E. R.R. Corp., 276 F.3d 992, 996 (8th Cir. 2002).  We consider these arguments in turn.

MidAmerican first argues that the public policy exception is applicable here and that our decision in Iowa Electric Light & Power requires us to vacate the arbitration award.  The Supreme Court has repeatedly reaffirmed the existence of a public policy exception and has explained that an arbitration award is unenforceable if it contravenes an "explicit public policy."  W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber Workers, 461 U.S. 757, 766 (1983).  The public policy in question "must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'"  Id. (quoting Muschany v. United States, 324 U.S. 49, 66 (1945)).  Our inquiry is further focused by the Supreme Court's decision in Eastern Associated Coal Corporation, where the Court explicitly stated that the question in these labor cases is not whether the employee's behavior violated some explicit public policy, but whether his reinstatement violates public policy.  E. Associated Coal Corp., 531 U.S. at 62–63.  Thus, it is not for us to determine whether Turner's behavior violated public policy; rather, the question is whether the arbitrator's award, with its requirement that Turner be reinstated into his previous position or

"transfer[ed] . . . to another position in the bargaining unit where more direct supervision is available," Arbitration Award at 13, violates "an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests." E. Associated Coal Corp., 531 U.S. at 62–63.  Applying the foregoing standard, we agree with the District Court that the arbitrator's award does not violate public policy for two related reasons.  First, we are unable to discern the type of explicit safety concerns within the statutes and regulations that govern the liquid natural gas industry that have led this and other courts to decline to enforce arbitrator's awards that require an employee's outright reinstatement.  Second, the arbitrator's decision in this case is fundamentally different from those awards that have been struck down for it does not require that Turner be reinstated into his sensitive position.  We consider these factors in turn.

First, MidAmerican is unable to identify any statutory or regulatory provisions that evidence an explicit public policy that would be violated if the arbitrator's award was enforced, a fact that distinguishes this case from Iowa Electric Light & Power.  In that case, an employee at a nuclear power plant disabled a federally-required safety mechanism (a set of sealed, interlocking doors that provide secondary containment in the event of an accident); an arbitrator eventually ordered that the employee should be reinstated.  Iowa Elec. Light & Power, 834 F.2d at 1426.  We had little trouble discerning an explicit and well-defined public policy in the voluminous statutory and regulatory framework governing the nuclear-power industry.  The framework within which that industry functions is a result of the unique dangers and attendant safety requirements of generating electric power by way of atomic fission.  Id. at 1428.  Accordingly, we concluded that the statutory and regulatory framework that was put in place to protect the public from the hazards of harnessing nuclear energy was a dominant, explicit, and well-defined public policy.  Thus, the arbitrator's award that required the outright reinstatement of the employee violated this dominant, explicit, and well-established public policy because the employee's knowing violation—which occurred after his participation in several classes discussing this very feature and

which occurred notwithstanding the extensive screening of employees in nuclear power plants—indicated that he could not be trusted to work in the dangerous environment to which the arbitrator ordered him returned. Our decision in that case was driven in part by the fact that the Nuclear Regulatory Commission—the official arbiter of this nation's nuclear policy—had already approved the employee's discharge. Id. at 1428. The present case is demonstrably different.

Although liquid natural gas is a hazardous substance and its storage in bulk quantities raises significant safety and security concerns, it is not regulated to the degree that the nuclear power industry is. Although the liquid natural gas industry is subject to safety regulations, MidAmerican is unable to identify statutory and regulatory provisions that demonstrate that liquid natural gas is so dangerous that a single violation of safety protocols is sufficient cause to deprive the employee of the opportunity to work for that company in any capacity, which is all the arbitrator's award provides for in this case. Rather, the regulatory framework on the federal level is more general and does not contain the specific and exacting requirements found in the regulations governing atomic energy. Compare, e.g., 15 U.S.C. §§ 717a–z (2000) (natural gas), with 42 U.S.C. §§ 2011–2297h-13 (2000) (atomic energy); and 49 C.F.R. §§ 193.2001–193.2917 (2002) (liquid natural gas), with 10 C.F.R. §§ 1–199 (2003) (atomic energy). On the state level, the regulations are mostly procedural. One chapter deals with the procedural requirements for obtaining a "permit to construct, maintain, and operate an intrastate gas pipeline and for the underground storage of gas." Iowa Admin. Code § 199-10.1(2)(479) (2003). A second chapter concerns the procedure for establishing "standards for a petition for a permit to construct, maintain, and operate a hazardous liquid pipeline and for the underground storage of hazardous liquids." Id. § 199-13.1(2). Yet a third chapter deals with the procedural aspects relating to the "standards regarding the transportation of natural gas to protect landowners and tenants from environmental or economic damages resulting from the construction, operation, or maintenance of pipelines." Id. § 199-12.1(2). Therefore, we are unable to discern the type of explicit safety concerns that

has led this and other courts to decline to enforce arbitrator's awards that require an employee's outright reinstatement. See, e.g., Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 861 F.2d 665, 674 (11th Cir. 1988) (vacating on public policy grounds an arbitration award requiring the outright reinstatement of pilot who was discharged for flying a commercial jet while intoxicated), cert. denied, 493 U.S. 871 (1989).

Second, the arbitrator's award in this case is qualitatively different than the one in Iowa Electric Light & Power, where the arbitrator ordered that the employee be reinstated into his original position in the nuclear power plant. In contrast to that case, the very real safety concerns that are evident in the liquid natural gas regulatory framework will not be violated by the arbitrator's award, for it merely requires that MidAmerican re-employ Turner in some position and not that it reinstate him to any position where he is without direct supervision and where the security and safety of the plant are in his hands. Here, we find an award that is explicitly conscious of the safety concerns Turner's actions engendered and does not require that Turner be re-employed in his sensitive position. Arbitration awards that are cognizant of safety concerns are regularly upheld by courts even where the employees in question work in safety-sensitive industries. For example, in International Brotherhood of Electrical Workers, Local 97 v. Niagara Mohawk Power Corporation, 143 F.2d 704 (2d Cir. 1998), the Second Circuit sustained an arbitration award that ordered an employee who tested positive for cocaine to be reinstated into his position at a nuclear power plant. However, the award in that case only reinstated the employee under certain conditions that the Second Circuit concluded would not violate the public policy evident in the regulations governing the nuclear power industry. Id. at 727–28. Specifically, the award conditioned his reinstatement on the employee's production of a negative drug sample, the employee's successful completion of any requirements imposed by the company's employee assistance program, and provided that the company could require that the employee be tested at random (and under observation) for up to eighteen months following his reinstatement. Id. at 713; compare Delta Air Lines, 861 F.2d at 674, with Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Intern.,

808 F.2d 76, 83–84 (D.C. Cir. 1987) (upholding award that ordered a pilot, who had flown commercial jet while intoxicated, to be reinstated only after he was certified by the Federal Air Surgeon as having sustained total abstinence from alcohol for not less than two years), cert. denied, 486 U.S. 1014 (1988). Because the arbitrator's award does not require that Turner be returned to his sensitive position, the District Court properly concluded that enforcing the arbitrator's award would not violate public policy.

We next turn to MidAmerican's claim that the arbitration award was procured by fraud. Section 10(a)(1) of the Federal Arbitration Act provides that a court can vacate an arbitration award "[w]here the award was procured by corruption, fraud, or undue means." Although the Federal Arbitration Act does not govern labor cases, it does inform our search for the federal common law that governs judicial review of arbitration awards in labor cases. See Misco, 484 U.S. at 40 n.9. Section 10(a)(1)'s fraud provision serves as grounds for vacating an arbitration award if the offended party proves the fraud by clear and convincing evidence, shows the fraud was not discoverable by due diligence before or during the proceeding, and shows that the fraud was materially related to an arbitration issue. Goff, 276 F.3d at 996 (applying § 10(a)(1) to Railway Labor Act case); see also Bonar v. Dean Witter Reynolds, Inc., 835 F.2d 1378, 1383 (11th Cir. 1988). In this case, the parties agree that the potential fraud was not discoverable before or during the arbitration proceedings, but they disagree as to whether fraud has been proved by clear and convincing evidence and whether the potential fraud was materially related to the arbitration.

As to the materiality element, we reject the Union's claim that Turner's deception, even if true, would not have affected the arbitration award. In fact, nothing could be further from the truth. If Turner's prevarications and dissemblings were established, it would not be possible to conclude that the award had not been procured by fraud. It is true that the arbitrator's award is explicitly premised on his conclusion that "[Turner's] lengthy and otherwise unblemished service with the

Utility warrants a reduction in the most severe of workplace penalties (termination)." Arbitration Award at 13. Still, it was not of little import to the arbitrator's conclusion that "at no time has [Turner] not taken full responsibility for his actions" and that Turner "cooperated at all times with Management during the course of their investigation, and has consistently owned up to what he did, indicating that he knew it to be wrong." Id. at 12. Further, the award specifically states that "[h]opefully, [Turner] will have learned from this experience the importance of trust, and the need for adhering to the requirements of his job assignment—whatever they may be. Should that again prove not to be the case, however, then a more severe penalty may well be justified." Id. at 13. Given these statements regarding how crucial the arbitrator felt that honesty and truthfulness were and given the fact that, if fraud is proven, the entirety of Turner's involvement in the arbitration process would be shown to be a sham, we conclude that the alleged fraud is material to the case at hand.

As far as the requisite clear and convincing proof of fraud, the Union correctly notes that to date the evidence merely shows that there is an inconsistency between the statements of Turner and his wife and Ms. Carey. Given this inconsistency and given the fact that the question of whether Turner and his wife lied is material, we hold that a material issue of fact remains to be determined, and therefore the District Court erred when it granted summary judgment on this issue. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).

Finally, we consider the Union's cross-appeal which seeks to overturn the District Court's decision not to award Turner back pay from the date he would have been reinstated if MidAmerican never sought to vacate the award. If the award was ambiguous, we would have to remand the case to the arbitrator for clarification in the event that the award was eventually upheld. See Glass Workers Int'l Union v. Excelsior Foundry Co., 56 F.3d 844, 849 (7th Cir. 1995). However, this award is not ambiguous, it is merely silent on this question and we will not treat this silence as ambiguity. See Int'l Union of Operating Eng'rs, Local No. 841 v. Murphy Co., 82

F.3d 185, 189 (7th Cir. 1996). Arbitrators undoubtedly know that their awards are subject to challenge in the district courts. Here, the arbitrator was faced with Turner's egregious conduct and MidAmerican's strong desire not to reemploy him, two facts which increased the likelihood of a court challenge to the arbitrator's award. Yet, the award that the arbitrator issued merely required that MidAmerican reemploy Turner in some capacity, denied back pay, and said nothing about awarding back pay during any legal challenge to the award that MidAmerican might bring. We see no ambiguity in the award and the District Court's decision not to award Turner back pay is affirmed.

## III.

Accordingly, the judgment of the District Court denying Turner back pay is affirmed and the judgment of the District Court with respect to MidAmerican's motion to vacate the arbitration award on grounds of fraud is reversed. The case is remanded for further proceedings consistent with this opinion on MidAmerican's claim that the arbitration award was procured by fraud.

_____