# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3740
_____

Boehringer Ingelheim Vetmedica, Inc.

*Plaintiff - Appellant*

v.

United Food and Commercial Workers, District Union Local Two

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: September 25, 2013
Filed: January 14, 2014
_____

Before LOKEN, COLLOTON, and BENTON, Circuit Judges.
_____

LOKEN, Circuit Judge.

Boehringer Ingelheim Vetmedica, Inc. ("BIVI"), is an international animal health pharmaceutical manufacturer with a production facility in St. Joseph, Missouri. At the time in question, a collective bargaining agreement ("CBA") between BIVI and District Local Two of the United Food and Commercial Workers (the "Union") governed the work of the facility's 275 production and maintenance employees. This

dispute arose when BIVI discharged a Grade 3 Lab Technician, Cheryl Silkett, for falsifying work records. The Union grieved the discharge, and BIVI and the Union then submitted the dispute to arbitration under Article XIX of the CBA. Finding that Silkett's violation of BIVI's plant rules was not "just cause" for the harsh termination remedy, the arbitrator ordered Silkett reinstated without back pay. BIVI commenced this action to vacate the arbitration award, arguing it did not draw its essence from the CBA and its enforcement would violate public policy reflected in United States Department of Agriculture ("USDA") regulations. The Union counterclaimed for enforcement of the award. The district court[1] granted summary judgment to the Union. BIVI appeals. Reviewing the district court's grant of summary judgment and legal conclusions *de novo*, we affirm. Trailmobile Trailer, LLC v. Int'l Union of Elec. Workers, 223 F.3d 744, 746 (8th Cir. 2000) (standard of review).

## I.

**A. The Relevant CBA Provisions and Plant Rules.** Article VI of the CBA granted BIVI the "exclusive right to manage the business efficiently, safely, and profitably and to direct the work force, including but not limited to, the right to . . . discipline, suspend, or discharge any employee for cause." Article XVII, Section 1, required employees to "observe all Employer rules and regulations covering protection of the plant, its contents, and the work being done therein." Disputes regarding employee discipline and discharge were subject to grievance and arbitration procedures set forth in Articles XVIII and XIX. Article XIX, Section 4, provided that the arbitrator may not "add to, subtract from, or modify any of the terms of [the CBA]" and that his "decision shall be final and binding on both parties."

---

[1]The Honorable David Gregory Kays, United States District Judge for the Western District of Missouri.

-2-

Acting under the management rights clause in Article VI, BIVI adopted Plant Conduct Rules ("PCRs") and Standard Operating Procedures ("SOPs"). The PCRs provided that committing a Group I offense "shall result in immediate discharge." Group I offenses included "[f]alsifying any employment records or any Company work records or time records." Article VIII, Section 3(d), of the CBA, titled "Loss of Seniority," provided that an employee's "continuous employment shall be broken and seniority rights and any and all other rights which the employee may have had under this Agreement shall be forfeited for . . . [f]alsifying employment records, time records, or any other Employer work records." Two SOPs required Silkett to monitor incubators daily for fluctuations in temperature, humidity, and carbon dioxide and to document all readings "at the time that [they are] performed."

**B. The Grievance Dispute.** On Tuesday, August 24, 2010, Silkett called in sick. Employee Beth Evans was assigned to carry out Silkett's duties. Evans noticed that the forms attached to seven pieces of equipment Silkett was monitoring had been pre-filled with the entire week's readings. Evans notified her superior. Confronted the following day, Silkett admitted pre-filling the forms. She explained this was done to "save time" and that she intended to correct any pre-filled data if the actual measurements varied. BIVI terminated Silkett for falsifying work records, a Group I offense. The Union grieved the termination. With the grievance unresolved, the parties agreed to submit the following issues to an arbitrator: "Was the Grievant discharged for just cause? And if not, what is the appropriate remedy?"

**C. The Arbitration Proceeding.** At the arbitration hearing, BIVI presented evidence that it had terminated four other employees for falsifying records. The Union introduced evidence that a custodial employee was only warned after twice falsely reporting she had cleaned a particular area. Silkett testified that, when she pre-filled data and called in sick during the previous year, her supervisor simply updated the forms without imposing discipline. Her supervisor did not remember this incident. In its post-hearing brief, BIVI argued that the PCR mandating discharge for

an employee who commits a Group I offense by falsifying work records provided just cause to terminate Silkett's employment. BIVI did not argue that Article VIII, Section 3(d), mandated the discharge remedy. Indeed, its brief did not cite Article VIII, Section 3(d).

The arbitrator found that "that falsification of Company records is a serious offense." As Silkett falsified records, a PCR Group I offense, and disobeyed the SOP, "discipline of some form, therefore, is appropriate." However, the arbitrator noted, Silkett's thirteen years of seniority without performance issues provided a "bank of good will," at least one other employee "was not discharged despite a falsification," and "there [was] no indication that [Silkett] was lying when she testified she intended to check the readings each day and make any corrections required." Accordingly, the arbitrator concluded, BIVI "in assessing the discipline did not give sufficient consideration to the circumstances of the case." The arbitrator partially sustained the grievance, reinstating Silkett with unbroken seniority, but denying her backpay "[d]ue to her admitted violation of the SOP and the falsification of Company records."

## II.

*A. The "Draws Its Essence" Issue.* We give substantial deference to labor arbitration awards because federal policy favors the resolution of private labor disputes by arbitration to which the parties agreed. As we have often noted, Supreme Court precedent teaches that an arbitrator's power is broad but not unlimited. An award "is legitimate only so long as it draws its essence from the collective bargaining agreement." United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960). "The arbitrator may not ignore the plain language of the contract . . . . But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987). We do not review

-4-

an arbitrator's interpretation of the CBA, so long as the arbitrator does not "disregard or modify unambiguous contract provisions." Trailmobile, 223 F.3d at 747. That standard is easy to recite but can be difficult to apply.

On appeal, BIVI contends that the arbitrator's award does not draw its essence from the CBA for two reasons. First, BIVI argues, the arbitrator ignored an unambiguous mandate in Article VIII, Section 3(d), that falsification of work records will result in discharge. The district court rejected this argument because BIVI did not present it to the arbitrator. Before the arbitrator, BIVI asserted that it had just cause to terminate Silkett because she committed an offense for which its PCRs mandated discharge. "Having requested that the arbitrator determine whether [Silkett] was terminated for just cause, [BIVI] cannot now be heard to complain that the arbitrator performed that very analysis." Bureau of Engraving v. Graphic Commc'n Int'l Union, Local 1B, 284 F.3d 821, 825 (8th Cir. 2002).

BIVI concedes it did not argue that Article VIII, Section 3(d), mandated discharge but argues that the issue was before the arbitrator because the entire CBA was part of the arbitration record. On the facts of this case, we agree with the district court that BIVI's failure to argue this issue waived it. In general, federal courts do not permit a party to withhold an issue or argument during arbitration and then, upon losing, raise it to the reviewing court. Cf. IBEW, Local Union No. 545 v. Hope Elec. Corp., 380 F.3d 1084, 1100-02 (8th Cir. 2004). As the Seventh Circuit said in Dean v. Sullivan, "We will not tolerate such sandbagging." 118 F.3d 1170, 1172 (7th Cir. 1997) (quotation omitted). Even if there may be cases in which exceptional circumstances would persuade a reviewing court to consider an issue or argument that a party failed to raise to the arbitrator, there are no such circumstances here. Indeed, given the narrow scope of our review, BIVI's failure to raise the Article VIII, Section 3(d), issue to the arbitrator *precludes* its favorable consideration by this court.

BIVI could prevail on this issue only if the application of Article VIII, Section 3(d), was plain and unambiguous. Had BIVI argued this provision to the arbitrator, instead of focusing solely on the similarly worded PCR, the Union would likely have responded that Silkett, by pre-filling data before the monitoring occurred, had falsified a draft or non-final "work record." While that falsification violated the SOPs and therefore the PCR, the Union would have asserted that Silkett's conduct should not be construed as the falsification of "Employer work records" for which Article VIII, Section 3(d), mandated loss of seniority and "all other rights" under the CBA. That contention might well have brought forth relevant extrinsic evidence on the issue, such as the negotiating history of Article VIII, Section 3(d). And in any event, if the arbitrator had accepted the contention and construed Article VIII, Section 3(d), more narrowly than BIVI urges us to construe it, that would be a decision "arguably construing or applying the contract" we could not refuse to enforce. Thus, we may not construe this provision in BIVI's favor in the first instance.

Second, BIVI argues that the award failed to draw its essence from the CBA because the arbitrator disregarded the mandatory discharge language contained in PCRs adopted under authority granted by the management rights clause of the CBA. We disagree. As the district court correctly noted, our precedent "differentiates between explicit contractual language and rules or policies promulgated under a general management rights clause." Trailmobile, 223 F.3d at 748. When a CBA acknowledges management's right to adopt plant rules unilaterally, that does not include the right to renege on the collectively bargained agreement that the employer will only discharge an employee "for cause." Cf. Breckenridge O'Fallon, Inc. v. Teamsters Union Local No. 682, 664 F.3d 1230, 1234 & n.2 (8th Cir. 2012). Only when the union has unambiguously agreed to an exception to the just cause limitation, either in the CBA or in an agreement resolving a particular disciplinary situation, will the arbitrator be precluded from conducting the collectively bargained just cause analysis. See Excel Corp. v. United Food & Commercial Workers Int'l Union, Local

431, 102 F.3d 1464, 1470 (8th Cir. 1996); Local 238 Int'l Bhd. of Teamsters v. Cargill, Inc., 66 F.3d 988, 990 (8th Cir. 1995).

We have held that an arbitrator may not "wr[i]te a relevant work rule out of the [CBA] by looking exclusively at an inconclusive outside source," such as his misinterpretation of state law. Alvey, Inc. v. Teamsters Local Union No. 688, 132 F.3d 1209, 1213 (8th Cir. 1997). But that is a narrow exception, and the arbitrator made no such irrelevant inquiry in this case. He specifically analyzed whether Silkett had committed a Group I offense by pre-filling the equipment monitoring sheets, concluded that she had, and then weighed the gravity of that misconduct against her work record, her credible testimony that any pre-filling errors would have been corrected in the final monitoring record, and evidence that BIVI had treated other record falsifications less harshly. That was a straightforward balancing of the management rights and just cause provisions and thus drew its essence from the CBA.

*B. The Public Policy Issue.* BIVI argues that the award must be vacated because its enforcement would violate public policies requiring competent personnel and the keeping of proper, reliable records in the animal health industry. In general, if a CBA as interpreted by an arbitrator would violate explicit public policy that is "well defined . . . by reference to the laws and legal precedents," the Supreme Court has held that "we are obliged to refrain from enforcing" the award. W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber Workers of Am., 461 U.S. 757, 766 (1983) (quotation omitted). As applied here, this narrow exception focuses not on whether Silkett's behavior violated well defined and dominant public policy, but on whether the arbitrator's decision to reinstate her would violate public policy. See E. Associated Coal Corp. v. UMW, Dist. 17, 531 U.S. 57, 62-63 (2000); MidAm. Energy Co. v. IBEW, Local 499, 345 F.3d 616, 620 (8th Cir. 2003).

BIVI relies primarily on our decision in Iowa Electric Light & Power Co. v. Local Union 204 of the IBEW, where we vacated an arbitration award reinstating an

employee of a nuclear power plant who knowingly violated safety protocols and federal regulations by improperly opening a door designed to control the spread of radiation. 834 F.2d 1424, 1425-26 (8th Cir. 1987). Reviewing the issue *de novo*, we concluded that reinstatement would violate the "well defined and dominant national policy requiring strict adherence to nuclear safety rules." Id. at 1427. We reasoned that the pervasive federal regulation of every aspect of nuclear power plant operation and safety demonstrated a public policy designed to protect public health or safety. Id. at 1428-29. But we cautioned that Iowa Electric "should not be read as a blanket justification for the discharge of every employee who breaches a public safety regulation." Id. at 1429. Thus, in MidAmerican Energy, we enforced an arbitration award reinstating an employee who violated a safety protocol, concluding that liquid natural gas industry regulations did not include "the specific and exacting requirements found in the regulations governing atomic energy." 345 F.3d at 621.

We do not agree with the Union and the district court that BIVI waived its right to challenge the award on public policy grounds by not raising this issue to the arbitrator. "Because collective bargaining agreements do not formulate public policy, and arbitrators cannot consider matters not encompassed by the governing agreements, the question of public policy is ultimately one for resolution by the courts." Iowa Electric, 834 F.2d at 1427, quoting W.R. Grace, 461 U.S. at 766. Our decisions in Iowa Electric and MidAmerican Energy gave no hint that the arbitrators had even considered public policy issues, yet we decided them on the merits. In Medicine Shoppe International Inc. v. Turner Investments, Inc., appellants raised a public policy issue for the first time in their brief to this court and therefore had waived the issue in the district court; the sentence suggesting that a public policy objection *must* be raised to the arbitrator was dicta that oversimplified the complex issues resolved in Hope Electric, the case cited. 614 F.3d 485, 489 (8th Cir. 2010).

However, failure to raise a potential public policy defense to the arbitrator prevents the development of a factual record on the issue. Given the narrowness of

this exception to our otherwise deferential standard of review, an employer's failure to raise the issue at the arbitration hearing will likely be fatal, as it is in this case. BIVI contends that, like the plant in <u>Iowa Electric</u>, its St. Joseph facility must comply with detailed federal regulations, here, regulations promulgated under the Virus-Serum-Toxin Act[2] that evidence a well defined and dominant public policy requiring competent employees and accurate records. <u>See</u> 9 C.F.R. § 114.7(b) ("personnel employed in the preparation of biological products . . . shall be competent in good laboratory techniques"); § 116.1(a) (licensees "shall maintain . . . detailed records of information necessary to give a complete accounting of all the activities within each establishment"); § 105.1(a)(4) (a facility's license may be suspended or revoked if it "has failed to provide complete and accurate information in . . . reports and records"). Without question, BIVI's business is comprehensively regulated to ensure the quality and safety of animal pharmaceutical products. It is also apparent the SOPs that Silkett violated when she pre-filled monitoring data were adopted, at least in part, to ensure compliance with these USDA regulations. <u>See, e.g.</u>, 9 C.F.R. § 116.1(a)(1) ("Records shall be made concurrently with the performance of successive steps in the development and preparation of biological products.").

But the question is whether these regulations evidence a well defined and dominant public policy requiring that "a single [regulatory] violation . . . is sufficient cause to deprive the employee of the opportunity to work for the company." <u>MidAm. Energy</u>, 345 F.3d at 621. Violations of the regulations BIVI cites must only be reported "[i]f at any time, there are indications that raise questions regarding the purity, safety, potency, or efficacy of a product, or if it appears that there may be a

_____

[2]21 U.S.C. §§ 151-159. This statute, which spawned what is now an extensive regulatory regime, was originally enacted in 1913 for a specific limited purpose -- to protect farmers "against the use of spurious, dangerous, and impotent serum" in their efforts to eradicate the hog cholera that was causing severe economic loss from livestock deaths. <u>See</u> 51 Cong. Rec. H3525, H3527 (1914) (statement of Rep. Lever); <u>Hall v. State</u>, 158 N.W. 362, 363 (Neb. 1916).

problem regarding the preparation, testing, or distribution of a product." 9 C.F.R. § 116.5(b). As the issue was not raised before the arbitrator, the record does not reflect, for example, how Silkett's pre-filling violation affected the "purity, safety, potency, or efficacy" of BIVI's animal pharmaceutical products, whether BIVI reported the violation to USDA under § 116.5(b), or whether BIVI would incur regulatory penalties as a result of Silkett's misconduct if she was reinstated to her former position. In short, BIVI has made nowhere near the factual and legal showing that would be required for this court to invoke the narrow public policy exemption and vacate an arbitration award that fully acknowledged Silkett's misconduct, denied her back pay as a result of that misconduct, but reinstated her to her former position.

For the foregoing reasons, the judgment of the district court is affirmed.

_____