# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-1565

_____

Garage Maintenance, Machine Warehousemen, Repairmen, Inside Men and
Helpers and Plastic Employees, Local No. 974, affiliated with the International
Brotherhood of Teamsters

*Plaintiff - Appellant*

v.

Greater Metropolitan Automobile Dealers Association of Minnesota, Inc., doing
business as Minneapolis Automobile Dealers Association (MADA); Golden
Valley Motors, Inc; Luther Automotive Group, Inc.; Motors Management, Inc.;
The Luther Company Limited Partnership, doing business as Rudy Luther Toyota/Scion

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: December 17, 2013
Filed: March 26, 2014

_____

Before WOLLMAN, LOKEN, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Local No. 974 ("Union") seeks to set aside an arbitration award that ruled in
favor of the Minneapolis Automobile Dealers Association ("MADA") and several

member car dealerships.  Finding no grounds to vacate the award, the district court[1] granted the defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  With jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

The Union and MADA have negotiated a series of collective bargaining agreements ("CBAs") memorializing the terms of their relationship.  Each one typically ends immediately before the next begins.  At issue here is the transition between the 2006 CBA and the 2010 CBA and its impact on above-scale time allowances.  Since the introduction of the Toyota Prius in 2001, Union technicians working on hybrid cars at Rudy Luther Toyota ("Luther Toyota") have received incentive pay, as such work was especially difficult and dangerous.  One hour spent working on hybrid cars was factored into their week's productivity as one and a half to two hours, depending on the particular task.  This differential is known as an above-scale time allowance, an accounting method that individual MADA member dealerships have used to compensate Union technicians for various types of work since the 1970s.  Luther Toyota was the only MADA member to provide such time allowances for hybrid car warranty and recall work, and it introduced the allowances unilaterally—without negotiation with the Union.

In negotiating the 2006 CBA—which would be effective from April 16, 2006, through April 15, 2009—MADA wanted to eliminate all above-scale time allowances.  The Union rejected the proposal but accepted a compromise: MADA member dealers could reduce higher time allowances for new employees hired on or after April 16, 2006.  The 2006 CBA was initially extended by mutual agreement through April 15, 2010, and then—so as not to chance a strike on a Friday, which

---

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

-2-

would disappoint customers—through April 17, 2010. Union and MADA representatives met on April 13, 2010, to conclude negotiation of the 2010 CBA and produced a "Tentative Contract Agreement." Copies of the Agreement were distributed to Union members on April 15; the members' ballots were counted on April 16, and the Agreement was overwhelmingly approved.

On April 15, Luther Toyota delivered to Union representatives a letter stating: "Please be advised that as of April 15, 2010 Rudy Luther Toyota will no longer pay any above scale wage rate or time allowance on Hybrid vehicles." On April 29, the Union filed a grievance against MADA, challenging Luther Toyota's letter as an unlawful breach of contract or failure to bargain under § 8(a)(5) of the National Labor Relations Act. After the grievance went to arbitration and the arbitrator ruled in favor of MADA, the Union sought to set aside the arbitration award in federal court. The Union here appeals the district court's grant of MADA's motion to dismiss.

## II. Discussion

We review de novo the district court's grant of a motion to dismiss an action under Fed. R. Civ. P. 12(b)(6) and the court's legal determination as to whether CBA language is ambiguous. Local 38N Graphic Commc'ns Conference/IBT v. St. Louis Post-Dispatch, LLC, 638 F.3d 824, 825 (8th Cir. 2011); John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers, 913 F.2d 544, 550 (8th Cir. 1990). Our review of the arbitration award itself, however, is far more deferential: "[a]s long as the arbitrator's award draws its essence from the collective bargaining agreement, and is not merely his own brand of industrial justice, the award is legitimate." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 35 (1987) (quotation omitted). If "the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Id. at 38.

The arbitrator framed the issue presented as: "Did the Employer violate the law [National Labor Relations Act § 8(a)(5)] or the [Collective Bargaining] Agreement when it terminated above-scale wage rates and time allowances on hybrid vehicles?"[2] To answer the question, both parties pointed to two specific provisions in the 2006 and 2010 CBAs: (1) "Incentive Option," providing protections for the type of incentive pay at issue here, and (2) "Maintenance of Standards," requiring certain conditions to be maintained based on those in effect on a specific date.[3] After specifying the incentive pay at various hours of production and for each year in the CBA term, the same language on incentive pay is present in both the 2006 and the 2010 CBAs, updating only the relevant dates: "If, however, on April 15, 2010 an Employer was paying a higher time allowance to technicians for any operation than the factory flat rate manual allows, that allowance will not be reduced. The Employer shall not be precluded from reducing any such higher time allowance with respect to those employees that were hired on or after April 16, 2006." 2010 CBA, Article VIII, Section 8.3; 2006 CBA, Article VIII, Section 3. Similarly, both CBAs provide for

_____

[2]The Union argues that the arbitrator misconstrued the dispute by focusing on the method used by MADA dealers to discontinue the above-scale time allowances rather than their right to do so. See Appellants' Br. at 18–20. The issue as phrased by the arbitrator allowed him to reach both issues, however, and the questions of right and of method inherently merge together. If a timely letter sent by a MADA member to the Union was an agreed-upon method to end time allowances, then the MADA member had the right to end the time allowances unilaterally.

[3]Although the Union argued before the district court that additional CBA provisions supported its position, the Union did not cite these provisions at arbitration. The issues raised by other CBA provisions were not before the arbitrator simply because the entire CBA was part of the arbitration record. Boehringer Ingelheim Vetmedica, Inc. v. United Food & Commercial Workers, 739 F.3d 1136, 1140 (8th Cir. 2014). Moreover, given our limited review in this context and absent exceptional circumstances, our determination in the ordinary case as to whether the arbitration award draws its essence from the CBA is confined to the CBA provisions raised before and interpreted by the arbitrator. Id.

"[m]aintenance of [s]tandards": "The Employer agrees that all conditions of employment in his/her individual operation relating to wage guarantee, hours of work, overtime differentials and general working conditions shall be maintained at not less than the highest minimum standards in effect at the time of the signing of this Agreement." 2010 CBA, Article XXVII (altered from 2006 CBA only to be gender-neutral); 2006 CBA, Article XXVII.

The Union argues that the language above unambiguously evinces a mutual intent to keep constant certain terms of employment, including above-scale time allowances, during a given CBA term. Since the 2006 CBA was extended through April 15, 2010, and then through April 17, 2010, Luther Toyota's April 15 letter stating that such time allowances would no longer be available effective as of that day was not a lawful way to terminate them. Instead, according to the Union, such changes presumably should have been done through the usual CBA negotiation process. MADA also takes the position that these CBA provisions are unambiguous but arrives at a different conclusion. Since new hires were specifically not entitled to such allowances, the Maintenance of Standards requirement is not absolute and does not require these allowances to continue from one CBA term to the next. Even if it did, MADA contends, it would apply only to those allowances in effect on the date that the 2010 CBA was signed, which was April 16, 2010—and Luther Toyota discontinued above-scale time allowances on April 15.

The arbitrator found it unambiguous that the parties intended for employees receiving above-scale time allowances in effect on April 15 to continue receiving the same allowances during the 2010 CBA term. He also found, however, that "contractual language in a bargaining agreement which might appear clear on its face can become unclear when an effort is made to apply it in a real life situation." Arbitration Award at 8. He credited MADA's argument that the Maintenance of Standards provision protected conditions in effect "at the time of signing of the

agreement," which took place on April 16, 2010; any conditions lawfully eliminated on April 15 were not protected going into the new CBA term. Id. at 21. Since the CBA language did not address the termination method, "the contract's silence creates a latent ambiguity." Id. at 20. The arbitrator therefore had to look to the "parties' bargaining history and day-to-day practices with respect to the [time allowances]" to ascertain their intent. Id. at 21.

Like the district court, we find that the arbitrator was "warranted" in determining the CBA's plain language to be "silent or ambiguous with respect to the disputed issue—how the above-scale time allowances could be legitimately terminated." Garage Maint., Local No. 974 v. Greater Metro. Auto. Dealers Ass'n of Minnesota, Inc., No. 11-02333, 2013 WL 500369, at *6 (D. Minn. Feb. 11, 2013). Both the Incentive Option and the Maintenance of Standards provisions show the parties' intent to keep incentive pay arrangements constant during a given CBA term. However, neither provision addresses how incentive pay may be changed: whether a change must be mutually agreed upon for it to be valid and whether such a change must be memorialized in a new CBA. The parties pointed to no specific CBA provision that definitively indicates the Union's and MADA's intent regarding the question before the arbitrator.

Although the arbitrator found several facts from extrinsic evidence, we find most relevant the testimony of MADA attorney Stephen Burton, whom the arbitrator deemed to be credible. Burton described the negotiation practices of MADA and the Union in 2006 and in 2010. See Arbitration Tr. at 158–65, 173–77. Burton stated that in 2006, Union Secretary Thomas Tweet proposed a mechanism for terminating above-scale time allowances that, unbeknownst to Burton, some dealerships were already using: sending a letter to the Union "prior to contract expiration putting the union on notice that it was the dealer's intention to eliminate those above-scale time allowances, and that going forward they would no longer exist." Id. at 162:15–25.

On cross-examination, Tweet did not deny that he had approved such a method. Id. at 67:23–68:12. Burton thought this procedure would be "an acceptable method of handling the issue on a store-by-store basis which would not require it to be brought up in negotiations forevermore." Id. at 163:17–19. Burton further testified that other than the instant dispute, the Union had never objected to the use of that procedure at the end of a contract term. Id. at 173:24–174:2. Finally, Burton described a conversation with Tweet about the exact question at issue: what would happen if a MADA member wanted to end above-scale time allowances going into the 2010 CBA term, given the repeated extensions of the 2006 CBA. Burton testified that when he asked Tweet whether it would be permissible for dealerships to "terminate those practices as of April 15[, 2010], even though the [2006] agreement was extended to the 17th," Tweet "had no problem with that whatsoever." Id. at 177:22–25.

In addition, the arbitrator cited examples, documented by letters presented at the arbitration hearing, of other MADA members who had attempted to cease paying above-scale time allowances. Arbitration Award at 7. Key Cadillac, for instance, tried to do so by sending a letter to the Union dated March 12, 2009, prior to the end of the 2006-2009 CBA term. Citing (among others) the CBA's Maintenance of Standards provision, Tweet wrote to Key Cadillac that because the 2006 CBA had already been extended through April 15, 2010, Key's letter "was not timely" and the dealership therefore could not "implement a reduction of conditions." In his letter, Tweet did not contest Key's ability to change incentive pay unilaterally or the dealership's method of communicating such a change. Key Cadillac later notified the Union of its intent to "eliminate any above scale wage guarantees and incentive rates [including] any time allowances that are in excess of the applicable manufacturer's flat rate manual" effective April 14, 2010, based on a letter to the Union dated April 5, 2010. The arbitrator found that "while Key Cadillac's 2009 attempt to eliminate allowances was met with opposition by the Union, Key's subsequent 2010 elimination took place without complaint and in the manner described by Mr.

-7-

Burton." Arbitration Award at 23. Since "it is the arbitrator's view of the facts . . . that [the parties] have agreed to accept," we may not consider challenges to those facts in this context as we do when "reviewing decisions of lower courts." Misco, 484 U.S. at 37–38.

With Burton's unrebutted testimony and the letters documenting other dealerships' similar conduct to help interpret the parties' past practice with respect to the ambiguous CBA language at issue, we conclude that the arbitration award drew its essence from the CBA. We therefore find no basis to vacate the arbitration award.

### III. Conclusion

We affirm the district court's order granting MADA's motion to dismiss the matter with prejudice.

_____