**NEWARK STEREOTYPERS' UNION NO. 18, Appellant,**

v.

**NEWARK MORNING LEDGER CO., and Newark Newspaper Publishers' Association.**

**No. 16571.**

United States Court of Appeals
Third Circuit.

Argued Feb. 9, 1968.

Decided June 18, 1968.

Certiorari Denied Nov. 18, 1968.

See 89 S.Ct. 378.

William R. Meagher, Skadden, Arps, Slate, Meagher & Flom, New York City, (Carpenter, Bennett & Morrissey, Newark, N. J., Thomas L. Morrissey, Newark, N. J., John D. Feerick, New York City, of counsel, on the brief), for appellant.

Bernard G. Segal, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Samuel D. Slade, Washington, D. C., Tobias J. Berman, New York City, Shanley & Fisher, Donald A. Robinson, Newark, N. J., Goldman, Evans & Goldman, New York City, of counsel, on the brief), for appellees.

## OPINION OF THE COURT

Before HASTIE, Chief Judge, FREEDMAN and VAN DUSEN, Circuit Judges.

FREEDMAN, Circuit Judge.

The plaintiff union appeals from the district court's confirmation of an arbitration award.

The arbitration decided a dispute concerning the number of men required for the safe and efficient operation of a new

M.A.N.[1] stereotype plate-casting machine which defendant, Newark Morning Ledger Company, the publisher of the Newark Star-Ledger newspaper, was installing in its plant. The union represents the operators of the machine under a collective bargaining agreement with the Newark Newspaper Publishers Association, also named as a defendant, as the agent of the Newark Morning Ledger Company.

Discussions between representatives of the union and the Ledger Company regarding the dispute failed to achieve agreement. The company insisted that the machine could be operated safely and efficiently by one man, while the union argued that at least two were necessary. Pursuant to the collective bargaining agreement each party appointed two representatives, and when these four were unable to resolve the dispute by a majority decision there came into operation a provision of the agreement for a binding arbitration after they had selected a neutral fifth member, who was to serve as chairman. They were unable, however, to agree on the selection of the fifth member and the union filed a complaint in the district court to compel arbitration. Jurisdiction was based on § 301 of the Labor Management Relations Act (29 U.S.C. § 185), and the complaint sought relief under § 5 of the United States Arbitration Act (9 U.S.C. § 5), which provides the federal law applicable to the dispute.[2] The district court ordered arbitration and named the neutral member of the arbitration panel.[3]

The arbitration panel heard testimony for six weeks and ultimately rendered an award upholding the company's right to employ a single operator on the machine. The two members designated by the union dissented. The majority found, on ample evidence to support its conclusion, that the latest model of the M.A.N. machine was a "fully automated one-man mechanical contrivance tried and proved by operative experience", which "had unquestioned success throughout the United States." The award was attacked by the union in a motion to vacate under § 10 of the United States Arbitration Act (9 U.S.C. § 10) and the company moved to confirm. After consideration of affidavits and oral argument by both parties the district court confirmed the award. 261 F. Supp. 832 (D.N.J.1967).

The union challenges the award on the ground that the arbitration panel refused to consider its claim that the company had intimidated and silenced its expert witness, Pezdirtz, whom it had called to testify regarding the construction of the M.A.N. machine and the number of men required for its safe and efficient operation. Pezdirtz formerly had been employed by the exclusive American distributor for the German manufacturer of the M.A.N. machine and therefore was familiar with it. Immediately prior to

1. The initials by which the machine is known are derived from the name of its German manufacturer, Machinen-Fabriken, Augsburg, Nürnberg.

2. See Textile Workers of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). As to the applicability of the United States Arbitration Act to cases brought under § 301 see Pietro Scalzitti Co. v. International Union of Operating Engineers Local 150, 351 F.2d 576, 579 (7 Cir. 1965); Signal Stat. Corp. v. Local 475, United Electrical, Radio & Machine Workers, of America, 235 F.2d 298 (2 Cir. 1956), cert. denied, 354 U.S. 911, 77 S.Ct. 1293, 1 L.Ed.2d 1428 (1957); Tenney Engineering, Inc. v. United Electrical, Radio & Machine Workers of America, Local 437, 207 F.2d 450 (3 Cir. 1953).

3. An earlier order by the district court requiring arbitration and ordering that two men operate the machine during the pendency of the arbitration proceedings was vacated on appeal because the district court had made no findings of fact as required by Rules 52(a) and 65(d) of the Federal Rules of Civil Procedure. Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 353 F.2d 510 (3 Cir. 1965). On remand the district court again ordered arbitration, with the fifth member it had previously designated but denied interim relief.

his appearance before the arbitration panel he had been employed by Wood Newspaper Machinery Corp., the manufacturer of a competing machine. The union had arranged with Wood that Pezdirtz should be taken off Wood's payroll for what was termed a leave of absence while he testified before the arbitration panel. The union paid his traveling expenses, maintenance and the earnings he would have received from Wood during the period of his service as a witness.[4] Pezdirtz appeared as a witness on January 12, 1966. He testified at length that day regarding the M.A.N. machine until at the suggestion of the chairman the panel recessed to permit Pezdirtz to inspect the machine at the Star-Ledger plant. When the sessions resumed next morning Pezdirtz refused to testify further and when pressed for the reason said that it was a personal one.

At this point the union's counsel suggested to the arbitration panel that Pezdirtz's refusal to testify was the result of improper conduct by officials of the Ledger Company and asked that the panel investigate whether a contempt had been committed against it and whether any outside influence was frustrating its function. The panel denied both requests and declared that if the union insisted on the testimony of Pezdirtz and he still refused to give it the appropriate procedure would be to apply to the district judge for an order directing him to resume his testimony. The panel recessed to enable the union to apply to the district judge for relief. The district judge, after an informal hearing in chambers announced that he was without jurisdiction to act during the pendency of the arbitration. The parties thereupon returned to the arbitration panel which at the union's request issued subpoenas to Pezdirtz, two executives of Wood and the principal stockholder of the Ledger Company. Only the subpoena directed to Pezdirtz was served.

Next day Pezdirtz appeared pursuant to the subpoena and again refused to testify or to give any reason for his refusal. The arbitration panel again declined to inquire into the reasons for Pezdirtz's refusal or to accept offers of proof with regard to it, ruling the entire matter irrelevant to the issues presented for arbitration. Upon the requests of Pezdirtz and the union the panel recessed for four days to allow Pezdirtz to consult with his personal counsel and to afford the union an opportunity to have two other expert witnesses examine the machine at the Star-Ledger plant.

Upon resumption of the proceedings on January 19, Pezdirtz appeared with his personal counsel who stated that Pezdirtz was now willing to testify. The union's counsel, however, refused to proceed with Pezdirtz unless he was first permitted to inquire into the reasons for Pezdirtz's original change of mind, and to enter into an investigation of it. He also claimed that Pezdirtz had not yet examined the machine as the panel had directed and therefore would be incompetent to testify regarding it. He therefore refused to put any questions to Pezdirtz on the ground that he was "a spoiled witness, and the quicker he is disposed of the better." When the panel asked if counsel would object if the committee discharged the witness he replied that he neither objected nor consented, but stood mute. The panel thereupon excused Pezdirtz. The hearings continued through February 18, and the panel heard many other witnesses, including the two additional expert witnesses for the union who had examined the M.A.N. machine at the Star-Ledger plant.

After the panel made its award on June 30, the union filed a motion to vacate and reiterated its demand for an investigation of its charges that officials of the Ledger Company had conspired with Wood to stifle Pezdirtz's testimony. It submitted affidavits setting out the substance of these claims which were challenged by affidavits filed on behalf

---

4. He had been paid $1,786.20 before his testimony abruptly ended.

of the company. The opposing affidavits are in agreement that the purchasing agent and principal stockholder of the newspaper chain of which the Star-Ledger is a member had telephoned Wood and that Wood in turn had called Pezdirtz. The union's affidavits claimed that the Ledger Company's officials threatened to cease doing business with Wood if Pezdirtz went on with his testimony. The Company's affidavits denied that it made any threats of reprisal and claimed that the purpose in calling Wood was to inquire into Pezdirtz's current employment status in light of his disingenuous testimony that he was currently unemployed, and upon clarification to use the information in cross-examining him. The district court held that the union's allegations were insufficient to justify vacation of the award, that the union had not been deprived of a fair hearing before the arbitration panel, and that it could not complain of the loss of Pezdirtz's testimony because it had itself rejected his subsequent offer to complete his testimony.

The United States Arbitration Act, which is based on the pioneering New York Arbitration Act,[5] and is substantially similar to the Uniform Arbitration Act,[6] has significantly altered the general common law principle that arbitrators are the sole judges of the case on the facts and the law,[7] by authorizing the vacation of an award on specified grounds. Section 10 empowers the federal courts to vacate an arbitration award:

"(a) Where the award was procured by corruption, fraud, or undue means.

\* \* \*

"(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." (9 U.S.C. § 10)

■ The statute was not intended to overthrow the general advantage of speedy and effective decision of disputes by arbitration and the creation of these general grounds does not obliterate the hesitation with which courts should view efforts to re-examine awards. See Karppinen v. Karl Kiefer Machine Co., 187 F.2d 32, 34–35 (2 Cir. 1951), A. N. Hand, J. To do otherwise would defeat the primary advantages of speed and finality which led to the development of arbitration in business disputes and which is made even more compelling by its expanding use in labor disputes where arbitration is a favorite of the so-called federal common law developed under § 301.[8]

We need not here define the limits of "corruption, fraud, or undue means" under § 10(a) or "misconduct" prejudicial to the rights of any party under § 10(c). We may assume that the obtaining of an award by perjured testimony would constitute fraud under § 10(a). See Karppinen v. Karl Kiefer Machine Co., supra, at 34. Here, however, there is no claim that perjured testimony was presented. The attack on the award runs the other way. It is based not on the falsehood

---

5. N.Y.Laws, 1920, c. 275.

6. The first Uniform Arbitration Act drafted in 1925, was adopted in Nevada, North Carolina, Pennsylvania, Utah, Wisconsin and Wyoming. A second version whose review provision is substantially identical with the 1925 Act was promulgated in 1955 and has been adopted in Arizona, Illinois, Maryland, Minnesota, Massachusetts and Wyoming.

7. See La Vale Plaza, Inc. v. R. S. Noonan Inc., 378 F.2d 569, 572–573 (3 Cir. 1967).

8. See United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

of any testimony presented, but instead on the claim that the union was deprived of testimony which otherwise would have have been available to it. The arbitration panel was fully aware of the claim that the company had stifled Pezdirtz's earlier readiness to testify for the union, for it was in its presence that Pezdirtz's original refusal to testify and his later willingness to go on occurred. The award followed after a conscious judgment by the arbitrators that the panel should not undertake an investigation of the union charge and there is no claim that the panel's conduct was corrupt or fraudulent or influenced by undue means.

We are thus led to the provision of § 10(c) dealing with "misconduct [by the arbitrators] * * * in refusing to hear evidence pertinent and material to the controversy", which results in prejudice to a party's rights.

■ Literally construed § 10(c) would make all rulings by arbitrators excluding evidence reviewable by the courts, and "misconduct" has already been construed authoritatively to mean not bad faith, but "misbehavior though without taint of corruption or fraud, [if] * * * born of indiscretion." Stefano Berizzi Co. v. Krausz, 239 N.Y. 315, 317, 146 N.E. 436, 437 (1925), Cardozo, J. The statute cannot be read, however, to intend that every failure to receive relevant evidence constitutes misconduct which will require the vacation of an arbitrator's award.

■ It is true that an attempt by a litigant to persuade a witness not to testify is properly admissible against him as an indication of his own belief that his claim is weak or unfounded or false.[9] But it has been held that even the erroneous exclusion of such evidence by a court would not be reversible error on appeal if it was not of substantial harm to the party.[10] In an arbitration case a court cannot act as a legal screen to comb the record for technical errors in the receipt or rejection of evidence by arbitrators, who in most cases are laymen. A fair accommodation between the words of the statute and the characteristic nature of arbitration would require that such an error must be one that is not simply an error of law, but which so affects the rights of a party that it may be said that he was deprived of a fair hearing. Even if full play is given to the inference that a party's effort to suppress the testimony of a witness indicates a weakness or lack of merit in his position, it must be recognized that the arbitrators here considered all of the other evidence which was presented to them by both sides on the merits of the issue whether the machine required more than one operator. While the suppression of evidence, if it occurred, may have had evidential value it cannot be said as a matter of law that it was decisive or that its exclusion was seriously harmful in the light of the other evidence in the case.

After Pezdirtz was excused the union presented the testimony of two other expert stereotypers and was afforded ample opportunity to cross-examine the experts whom the company presented on its own behalf. It had the four week period after the Pezdirtz incident, during which the hearings continued, to procure other evidence if it deemed it necessary to do so. More fundamental even than this is the fact that the union itself refused to examine Pezdirtz when he announced his readiness to go forward as a witness after consulting with his independent counsel. Having taken this position at the time the union may not now assert as a fact that Pezdirtz would not have testified in its favor. It cannot have the advantage of an assumption which runs contrary to the witness's offer when it was itself unwilling to accept or even test it. It could not by its own conduct make the effort it attributed to the company successful and then protest at the

9. See Great American Insurance Co. v. Horab, 309 F.2d 262 (8 Cir. 1962), citing many cases; 2 Wigmore, Evidence § 278 (3d ed. 1940).

10. Great American Insurance Co. v. Horab, supra, n. 8.

**600**

success. Nor in view of the position which the union took before the arbitration panel at that time is it appropriate for us to speculate now on what the union might have done if in continuing the examination of Pezdirtz it had been surprised by adverse instead of favorable testimony, and the panel had persisted in its refusal to hear the union's allegations. It is enough that the union which had called him and had been balked temporarily in its effort to obtain his testimony subsequently was afforded the opportunity to have it but refused to accept it.

 In these circumstances the case calls for the application of the principle that an award will not be vacated because of an erroneous ruling by arbitrators, which does not affect the fairness of the proceeding as a whole. As the court said in Karppinen v. Karl Kiefer Machine Co., supra, 187 F.2d at 35, even if perjury is proven and constitutes fraud under § 10(a) of the Act, it will not justify the vacation of an award if it concerns an issue remote from the question to be decided.

Here the union's contention that the arbitration panel should have held an inquiry or investigation for the general purpose of exposing the misconduct of the company was peripheral to the issue of fact which was before the arbitrators for decision. The panel had no general investigatory function, and the union did not claim the benefit of the inference that the company's position on the issue before the panel was weak or unfounded because of an effort to suppress Pezdirtz's testimony. Whatever might have come from the vindication of the integrity of the proceedings would not affect the question whether the union had a fair hearing on the factual issue whether the M.A.N. machine could be safely and efficiently run with one operator. Even if it touched upon the problem to some extent it is not so substantial or pervasive that the award arrived at by the arbitrators after lengthy hearings and the presentation of subsantial evidence by both sides long after the Pezdirtz inci-

dent had ended must be cast aside as a quasi-judicial product which is tainted either by fraud or misconduct.

The judgment of the district court will be affirmed.