**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3425
_____

TODD FRANCE

v.

JASON BERNSTEIN,
Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-20-cv-1443)
District Judge: Honorable Yvette Kane
_____

Argued
March 14, 2022

Before: JORDAN, KRAUSE and PORTER, *Circuit Judges*

(Filed: August 9, 2022)
_____

John D. Comerford [**ARGUED**]
James B. Martin
Dowd Bennett
7733 Forsyth Boulevard – Suite 1900
St. Louis, MO 63105
        *Counsel for Appellant*

William J. Clements
Michael A. Iaconelli
Glenn A. Weiner [**ARGUED**]
Klehr Harrison Harvey Branzburg
1835 Market Street – Suite 1400
Philadelphia, PA 19103
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

**JORDAN**, *Circuit Judge*.

Courts will disturb an arbitration award only in limited circumstances, but those circumstances do occasionally arise. Under the Federal Arbitration Act ("FAA"), a court may, for example, vacate an award that was procured by fraud, and fraud is exactly what Jason Bernstein says was perpetrated by Todd France in the arbitration underlying this suit. Like something out of the film *Jerry Maguire*, these two sports agents fought over Bernstein's claim that France improperly organized a money-making event for a football player who was then one of Bernstein's clients, all in an effort to induce that player to fire Bernstein and hire France. The matter went to arbitration, and, in pre-hearing discovery, France denied

2

possessing any documents pertaining to the event. He flatly denied having any involvement in the event at all. The end of this tale hasn't been told yet, but this much is now clear: France lied to Bernstein and the arbitrator, though his lies were not uncovered until after the arbitration was decided in his favor. Because the arbitration award was procured by France's fraud, we will reverse the District Court's order confirming the award and will remand with the instruction to vacate it.

## I. BACKGROUND

### A. The Parties and the Signing Event

Bernstein and France are certified contract advisors (more commonly referred to as agents) registered with the National Football League Players Association ("NFLPA"). They each represent NFL players in contract negotiations with NFL teams and in related matters. Bernstein is also the majority owner of Clarity Sports International LLC ("Clarity Sports"), which advises and represents professional athletes in matters other than their playing contracts, such as marketing and endorsement contracts. France, meanwhile, worked for the agency CAA Sports LLC ("CAA Sports") during the period relevant to this case. As agents for NFL players, Bernstein and France must comply with the NFLPA Regulations Governing Contract Advisors ("the NFLPA Regulations"), which are a product of the collective bargaining agreement the players have with the NFL and its constituent teams.

Bernstein's roster of clients used to include Kenny Golladay, a wide receiver who signed a standard representation agreement with Bernstein in late 2016, before Golladay's rookie season with the Detroit Lions in 2017. Golladay

3

simultaneously signed a separate agreement with Bernstein's Clarity Sports for representation in endorsement and marketing deals. Under those contracts, Bernstein and Clarity Sports were Golladay's exclusive representatives. As required by the NFLPA Regulations, the contracts were filed with the NFLPA.

That agency relationship ended on January 29, 2019, when Golladay terminated both agreements. Break-ups are seldom happy affairs, but Golladay's goodbye was particularly troubling to Bernstein because, three days earlier, Golladay had participated in an autograph-signing event in Chicago that Bernstein had played no role in arranging – even though setting up such publicity and money-making opportunities for Golladay was precisely what Bernstein and Clarity Sports were hired to do. Bernstein became aware of the event, but only because he saw a Facebook post from one of the three sports memorabilia dealers promoting it. Once Golladay's agreements with Bernstein and Clarity Sports were terminated,[1] Golladay immediately signed with France. Bernstein soon came to believe that France and his colleagues from CAA Sports were behind the signing event the whole time.

## B. Arbitration

Five months later, Bernstein filed a written grievance against France pursuant to the dispute resolution provisions in the NFLPA Regulations. In his grievance, Bernstein alleged,

---

[1] Pursuant to the standard representation agreement, termination occurred five days after Golladay gave notice, which, according to the arbitrator, was on January 24.

4

"[o]n information and belief," that France initiated contact with Golladay, arranged and negotiated the autograph-signing event for him, and then used the event's proceeds to induce him to terminate his relationship with Bernstein and to sign with France. (J.A. at 90-91.) In doing so, Bernstein said, France violated two provisions of the NFLPA Regulations. First, he allegedly violated Section 3.B(2), which prohibits agents from "[p]roviding or offering money or any other thing of value to any player or prospective player to induce or encourage that player to utilize his/her services[.]" (J.A. at 50, 92.) Second, France allegedly violated Section 3.B(21)(a), which prohibits agents from

> [i]nitiating any communication, directly or indirectly, with a player who has entered into a Standard Representation Agreement with another Contract Advisor and such Standard Representation Agreement is on file with the NFLPA if the communication concerns a matter relating to the:
> (i)  Player's current Contract Advisor;
>
> (ii)  Player's current Standard Representation Agreement;
>
> (iii)  Player's contract status with any NFL Club(s); or
>
> (iv)  Services to be provided by prospective Contract Advisor either through a Standard Representation Agreement or otherwise.

(J.A. at 52, 92.)  Bernstein alleged that he had suffered $2.1 million in pecuniary losses, which he claimed is what his commissions on Golladay's next big playing contract and accompanying endorsement and marketing deals would have been.  As required by the NFLPA Regulations, the dispute was referred to arbitration.

### 1.      Pre-Hearing Discovery

The NFLPA appointed an arbitrator, and the parties were permitted to take discovery from each other before the hearing.  That discovery included document production and depositions of Bernstein and France, although France resisted such discovery and forced Bernstein to pursue an order from the arbitrator.  At France's deposition on November 7, 2019, he repeatedly denied having any involvement in Golladay's participation at the autograph-signing event.

Bernstein's efforts to obtain documents from France proved frustrating.  Although France promised to produce documents in response to certain requests – and eventually did produce some, though only after Bernstein complained to the arbitrator – France denied having any documents responsive to key requests about Golladay's appearance at the signing event.  Specifically, Bernstein asked for

- "Each and every document, or communication from you to any other person, that concerns, relates to, or mentions the January 21, 2019 appearance and autograph signing by Kenny Golladay that is referenced in the Grievance."

6

- "Each and every document, or communication from you to any other person, that concerns, relates to, or mentions the negotiations and/or discussions for, about, or concerning the January 21, 2019 appearance and autograph signing by Kenny Golladay that is referenced in the Grievance."

- "Any contracts or agreements that concern, relate to, or mention the January 21, 2019 appearance and autograph signing by Kenny Golladay that is referenced in the Grievance."

- "Any contracts, agreements, documents or communications that concern, relate to, or mention the sale of merchandise, items, and/or sports memorabilia signed, autographed, and/or inscribed by Golladay during the January 21, 2019 autograph signing that is referenced in the Grievance."

(J.A. at 2807-08.)

France's response to each of those requests was "none." (J.A. at 2807-08.) France also took the position that he would produce documents only if they were in his personal possession. He asserted that he would not collect and produce documents in the possession of non-parties, including "co-employees at CAA Sports, representatives, attorneys, accountants, affiliates and agents[,]" despite Bernstein's stated desire to reach those people with his document requests. (J.A. at 2804.) In other words, in France's world, it didn't matter whether documents were under his control; if they were not physically in his possession, he was not going to turn them over.

Bernstein took issue with France's cramped interpretation of his (France's) discovery obligations, and he brought the issue to the arbitrator's attention in an email requesting an order that France produce responsive documents in CAA Sports' possession. In response, France declared that only he – and not CAA Sports or any of his colleagues – was bound by the NFLPA Regulations and thus obligated to comply with discovery in arbitration. Nevertheless, he promised that, "for the avoidance of any doubt, [he was] in fact producing the responsive documents that [were] in [his] possession or control" (J.A. at 2816) – even though "control" seemed not to mean much, if anything, to him, because he maintained that he did not control documents in the possession of CAA Sports (or any other non-party).

Bernstein still wanted access to documents from individuals and entities other than France alone, and so, with just a few weeks until the first day of the arbitration hearing, he opted "to end the debate" over the scope of France's obligation to produce documents. (J.A. at 2814.) In order to do so, he asked the arbitrator to authorize a subpoena for documents from CAA Sports. Soon after, he requested authorization for six additional subpoenas directed to other non-parties: Golladay; the three sports memorabilia dealers that promoted the signing event; Golladay's mother; and a mentor of Golladay's named Kenneth Saffold, Jr.[2] The

---

[2] Golladay, his mother, and Saffold had signed affidavits attached to France's supplemental answer to the grievance. Their affidavits were consistent with the story

8

arbitrator authorized all seven subpoenas, but, he cautioned, he did not have authority to enforce those subpoenas.

Bernstein served the subpoenas on CAA Sports, two of the sports memorabilia dealers, and Saffold.[3] The record does not show whether he served the other non-parties for whom subpoenas were issued. Because Bernstein did not seek to enforce any of the subpoenas in federal court, he had to live with whatever was voluntarily given. That turned out to be nothing, with the exception of Saffold's testimony at the hearing, as summarized below.

### 2. Arbitration Hearing

The arbitration hearing was held in Alexandria, Virginia, on November 19 and December 12, 2019. The arbitrator heard testimony from France, Bernstein, Saffold, and a Clarity Sports employee. France repeatedly and consistently denied that he had anything to do with the autograph-signing event, and he emphasized that Bernstein had no evidence – documentary or testimonial – showing anything to the contrary. Bernstein nevertheless got on the record that

France later presented at the arbitration hearing. *See infra* Section I.B.2.

[3] The parties dispute whether any of the non-party subpoenas were properly served. According to France, Bernstein served non-party subpoenas on France's counsel, who may not have been an appropriate representative for service of subpoenas.

9

Golladay was paid approximately $7,750 for his attendance and participation at the signing event.

In his defense, France presented evidence suggesting that the signing event had little to do with Golladay's decision to switch agents. According to testimony from Saffold, during the 2018 offseason, Golladay and Saffold discussed ways to build Golladay's brand. One step to doing that, Saffold suggested, was for Golladay to get out and network with other players and professionals in the business. A networking opportunity arose in September 2018: a charity bowling event hosted by one of Golladay's teammates. With Safford's encouragement, Golladay attended, and he introduced himself to France, who was also there because he represented the host player. According to France's testimony, Golladay told France he was considering changing agents and asked for his phone number. France gave Golladay his number, though he did not recognize who he was. A later scan of the faces on the Lions' roster told France that it was Golladay who had introduced himself.

Still in France's version of events, Golladay soon texted France to follow up on their conversation at the bowling alley. They eventually arranged to meet for dinner in early October in Detroit. Golladay wanted to vent his frustrations about working with Bernstein and to hear more about what France did for his clients. The meeting went well, so two months later, Golladay had France meet Golladay's mother, whom Golladay wanted to "keep … in the loop[,]" according to Saffold's testimony. (J.A. at 317.) After Thanksgiving, Golladay introduced France to Saffold, who then contacted France's references and found no "red flags[.]" (J.A. at 318.) By mid-December, Golladay was ready to terminate his relationship

10

with Bernstein, but Saffold told Golladay to wait until after the 2018 season was over. That pushed the issue off until late January 2019, when Golladay finally notified Bernstein that he was ending their agency relationship. In other words, according to France's version, the timing of the autograph-signing event was purely coincidental.

The arbitrator was persuaded by that story and ruled that Bernstein did not meet his burden of proving that France had violated either provision of the NFLPA Regulations invoked in the grievance. More specifically, because France had nothing to do with the signing event – and because Golladay had already made up his mind to switch to France by that point – France did not violate Section 3.B(2)'s prohibition on agents providing a thing of value to induce a player to sign with him. And because Golladay initiated contact with France at the charity event, France did not violate Section 3.B(21)(a)'s prohibition on agents approaching already-represented players. The arbitrator thus denied Bernstein's grievance in an award dated March 27, 2020.

## C. Parallel Action in Federal Court

Later revelations call that award into serious question. It turns out that France did indeed have crucial evidence that should have been available to Bernstein in the arbitration. While pursuing his NFLPA grievance against France, Bernstein, along with Clarity Sports, was also litigating a case (the "Parallel Action") in the U.S. District Court for the Middle District of Pennsylvania against CAA Sports and the three sports memorabilia dealers involved in the signing event. The suit alleged tortious interference with contractual relationships. *See* Third Amended Complaint, *Clarity Sports Int'l LLC v.*

11

*CAA Sports LLC*, No. 1:19-cv-00305-YK-SES (M.D. Pa. July 17, 2020), ECF No. 120. Discovery in that suit yielded information pertinent to the grievance against France. The problem for Bernstein was that the information did not surface until June 2020, roughly two months after the arbitrator's decision denying the grievance. Bernstein had asked the arbitrator for an extension to file a post-hearing brief in light of the then-anticipated evidence from the Parallel Action, but the arbitrator denied that request.

The newly revealed evidence showed that France was in fact involved with the autograph-signing event. His involvement was at least implied in an interrogatory response from one of the memorabilia dealers, who said that one of France's colleagues at CAA Sports, Jake Silver, was instrumental in setting up the signing event:

> Jake Silver is the person we have historically dealt with at CAA. Near the Christmas holidays in late December 2018, I had a telephone conversation with Jake Silver regarding such marketing events (such calls between us and various other parties are not unusual, but occur frequently in our ordinary course of business). … [W]hile discussing the possibility of various signing events, Jake Silver mentioned that Mr. Golladay, a player for the Detroit Lions, might be interested in doing an autograph signing event, and asked us if we were interested.

(J.A. at 1833.) The same dealer also produced screenshots of text messages, one of which showed a thread among the dealers discussing event logistics, including "[c]ar service for

Kenny/mom/Todd CAA[,]" presumably referring to Golladay, his mother, and France. (J.A. at 1853.) In a subsequent deposition, the dealer admitted that Silver said that someone named Todd would be joining Golladay at the signing event. No one has suggested who else "Todd" from CAA could be except for Todd France. In fact, Bernstein received other evidence showing that France was scheduled to fly to Chicago the day before the event.

As discovery continued in October 2020, it became perfectly clear that France was involved in arranging the signing event. CAA Sports produced an email from Silver to France attaching a contract for the event for Golladay's signature, plus another email from France to Golladay attaching the same contract and asking him to sign and return it.

### D. Action to Confirm or Vacate the Arbitration Award

Shifting back in time to April 2020, a month after the arbitrator issued the award denying Bernstein's grievance, France filed a petition to confirm the award in the U.S. District Court for the Eastern District of Virginia, the district encompassing the site of the arbitration. Shortly thereafter, he filed a motion seeking the same relief. With new evidence in hand, Bernstein then cross-moved to vacate the award, arguing, among other things, that France had procured the arbitration award by fraud. His motion to vacate relied on the memorabilia dealer's interrogatory response about being contacted by Silver and the text message screenshot and deposition testimony showing that "Todd" was going to ride with Golladay to the signing event.

13

In opposition, France asserted, among other things, that Bernstein could not prove that the evidence was not previously discoverable through diligence. Bernstein replied that he had been diligent in seeking discovery from non-parties to the arbitration but could not obtain enforcement of the arbitrator-issued subpoenas and was not required to do so. He argued that there was too little time before or between the two days of the arbitration hearing to enforce those subpoenas. He further asserted that he had diligently sought information from the memorabilia dealers in his Parallel Action.

A few months later, France's petition for confirmation of the arbitration award was transferred from the Eastern District of Virginia to the Middle District of Pennsylvania. Bernstein then requested leave to file additional information in support of his motion to vacate, attaching as exhibits the newly produced emails sent by Silver and France with the signing-event contract.[4] He acknowledged the extensive briefing on the cross-motions to confirm or vacate the arbitration award, but he argued that the newly revealed emails now "prove[d] with absolute certainty that the result in the Arbitration was procured by 'fraud, corruption or undue means' within the

---

[4] The email exchange was obviously damning on its own but also served to refute evidence France had tendered. In response to Bernstein's argument that neither France nor Silver had submitted a sworn statement denying the memorabilia dealer's testimony in the Parallel Action that CAA Sports coordinated the signing event, France submitted a sworn affidavit from Silver in which Silver attested that he organized the event but never mentioned it to France.

14

meaning of 9 U.S.C. § 10[,]" a provision of the FAA. (J.A. at 2739.)

In the same order in which the District Court accepted the filing of Bernstein's additional information, it granted France's motion to confirm the award and denied Bernstein's motion to vacate it. Noting the narrow circumstances in which a court may vacate an arbitration award, the Court reasoned that Bernstein had not offered a satisfactory reason for why the late-discovered evidence of France's involvement in the signing event was not discoverable before or during the arbitration hearing. It specifically noted Bernstein's failure "to seek judicial enforcement of [his] subpoenas pursuant to the clearly established procedures of 9 U.S.C. § 7,"[5] which the Court saw as a lack of diligence that undermined any

---

[5] That section of the FAA provides in pertinent part:

[I]f any person or persons … summoned to testify shall refuse or neglect to obey said summons, upon petition the United States district court for the district in which such arbitrators, or a majority of them, are sitting may compel the attendance of such person or persons before said arbitrator or arbitrators, or punish said person or persons for contempt in the same manner provided by law for securing the attendance of witnesses or their punishment for neglect or refusal to attend in the courts of the United States.

9 U.S.C. § 7.

justification for "combing through the record in a separate action" to reconsider the arbitrator's decision. (J.A. at 10.)[6]

Bernstein moved for reconsideration, making two primary arguments. First, he responded to the District Court's conclusion that he had failed to explain why he did not seek enforcement of the arbitration subpoenas. He said that a federal action seeking enforcement of the subpoenas would have been futile, because the parties who had later produced the damaging evidence were all located more than 100 miles from Alexandria and thus fell beyond the range of enforcement of a subpoena issued by the district court located there. Second, he emphasized that France had committed discovery abuse in the arbitration by representing that he was willing to produce documents responsive to Bernstein's requests but that "none" were in his possession pertaining to the signing event. Thus, even setting aside the non-party subpoenas, France's non-production fraud was not earlier discoverable and warranted vacatur of the arbitration award. For those two reasons, argued Bernstein, reconsideration was necessary to correct a clear error of law and to prevent manifest injustice.

The District Court denied the motion for reconsideration, declaring that Bernstein was advancing an argument that could have been raised earlier. It noted that France, in his opposition to Bernstein's motion to vacate, specifically argued that Bernstein had failed to exercise

---

[6] The Court also rejected Bernstein's separate argument, which he does not press on appeal, that the arbitrator refused to hear pertinent evidence by not requiring that Golladay appear at the hearing.

16

diligence in seeking enforcement of the arbitration subpoenas, "and [Bernstein] had the ability to respond to this point in [his] reply brief." (J.A. at 21.) Although Bernstein in fact had responded, he had argued only that he did not have enough time to seek enforcement of the subpoenas before the fast-approaching arbitration hearing, not that he was out of geographic range for enforcement. The Court did not address Bernstein's separate argument that France's non-production fraud was not discoverable and was on its own an adequate basis for vacatur.

Bernstein has timely appealed.

## II.    DISCUSSION[7]

It's a steep climb to vacate an arbitration award. To preserve the parties' agreement for arbitration in lieu of

---

[7] The FAA does not independently create federal question jurisdiction, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983), but the District Court had diversity jurisdiction under 28 U.S.C. § 1332. We note that the Supreme Court recently held that jurisdiction over requests to confirm or vacate arbitration awards must be based on "the application actually submitted to" the court, not on the underlying substantive controversy between the parties. *Badgerow v. Walters*, 142 S. Ct. 1310, 1314 (2022). That holding does not upset the District Court's jurisdiction here, because France's petition submitted to the District Court established diversity jurisdiction, as Bernstein is a citizen of Maryland and France is a citizen of Georgia. We have jurisdiction pursuant to 9 U.S.C. § 16(a)(1)(D).

litigation, "[t]here is a strong presumption under the [FAA] in favor of enforcing arbitration awards." *Hamilton Park Health Care Ctr. Ltd. v. 1199 SEIU United Healthcare Workers E.*, 817 F.3d 857, 861 (3d Cir. 2016) (quoting *Brentwood Med. Assocs. v. United Mine Workers*, 396 F.3d 237, 241 (3d Cir. 2005)). "[T]he standard of review of an arbitrator's decision is extremely deferential." *Indep. Lab'y Emps.' Union, Inc. v. ExxonMobil Rsch. & Eng'g Co.*, 11 F.4th 210, 215 (3d Cir. 2021). "We will 'vacate [an award] only under [the] exceedingly narrow circumstances' listed in 9 U.S.C. § 10(a)." *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 251 (3d Cir. 2013) (alterations in original) (quoting *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003)). That particular provision of the FAA allows a federal court "in and for the district wherein the award was made" to vacate the award in a few very specific circumstances,[8] one of which is "where the

---

"On appeal from a district court's ruling on a motion to confirm or vacate an arbitration award, we review its legal conclusions de novo and its factual findings for clear error." *CPR Mgmt., S.A. v. Devon Park Bioventures, L.P.*, 19 F.4th 236, 244 n.8 (3d Cir. 2021) (internal quotation marks omitted). The District Court here did not make any factual findings with respect to the veracity of France's representations in arbitration or the steps Bernstein took to discover France's falsehoods. Rather, it reached a legal conclusion about the reasonableness of Bernstein's diligence, based on undisputed facts.

[8] Although the arbitration award was issued in the Eastern District of Virginia, Bernstein could still seek a vacatur in the Middle District of Pennsylvania after France's confirmation petition was transferred. Section 10's venue provision is permissive, allowing a motion to vacate to be

award was procured by corruption, fraud, or undue means[.]" 9 U.S.C. § 10(a)(1).

Bernstein says that the arbitration award here was procured by fraud because of France's non-production of responsive documents, as well as his false testimony at the arbitration hearing and his pre-hearing deposition.[9] A party making a claim like Bernstein's must make a three-part showing: first, that there was a fraud in the arbitration, which must be proven with clear and convincing evidence; second,

---

brought "either where the award was made or in any district proper under the general venue statute." *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 195 (2000). And any objections to venue in this action lying in the Middle District of Pennsylvania under the general venue statute, 28 U.S.C. § 1391(b), have long since been forfeited. *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979).

[9] Bernstein makes a passing argument that the arbitration award was alternatively procured by "undue means" – also a ground for vacatur listed in § 10(a)(1) – but he concedes that the term "has not been defined by the courts" and ultimately refers back to the more established test for deciding whether an award was procured by fraud. (Opening Br. at 29-30.) Because Bernstein does not make any undue-means arguments that are any different from his fraud arguments, we need not try to delineate the precise boundaries of those two bases for vacating an award. *Cf. A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1404 (9th Cir. 1992) (applying three-part "fraud" test to cases raising claims of "undue means").

that the fraud was not discoverable through reasonable diligence before or during the arbitration; and, third, that the fraud was materially related to an issue in the arbitration. *E.g.*, *Odeon Cap. Grp. LLC v. Ackerman*, 864 F.3d 191, 196 (2d Cir. 2017).[10]  As the party moving to vacate, Bernstein "bears the burden of proof" on those points. *PG Publ'g, Inc. v. Newspaper Guild of Pittsburgh*, 19 F.4th 308, 314 (3d Cir. 2021).

## A.     There Was Fraud

Perhaps the easiest conclusion in this case, even under a clear-and-convincing-evidence standard, is that France committed fraud. As other courts have held, "[o]btaining an award by perjured testimony constitutes fraud." *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1297 (9th Cir. 1982); *accord Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383-84 (11th Cir. 1988); *cf. Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 598 (3d Cir. 1968) (assuming in dicta that perjury constitutes fraud). Further, at least for purposes of § 10(a)(1) of the FAA, "knowingly conceal[ing] evidence" is "analogous to perjured testimony." *Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co.*, 415 F. Supp. 133, 138 (D.N.J. 1976).

---

[10] *See also Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc.*, 335 F.3d 497, 503 (6th Cir. 2003); *Gingiss Int'l, Inc. v. Bormet*, 58 F.3d 328, 333 (7th Cir. 1995); *A.G. Edwards*, 967 F.2d at 1404; *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988).

On the record before us, it is plain that France both lied under oath and withheld important information demanded in discovery. In response to Bernstein's document requests, France said – and then repeated "for the avoidance of any doubt" (J.A. at 2816) – that he was going to produce responsive documents in his possession.[11] But, as for documents pertaining to the signing event, he represented that there were "none." He then doubled down by denying in his pre-hearing deposition and at the hearing that he had any knowledge of or involvement in the signing event. His lawyer voiced the same position in his opening statement at the arbitration hearing: France simply had "no involvement with" the event. (J.A. at 292.)

None of that was true, as revealed by the evidence uncovered in Bernstein's Parallel Action. Text messages and deposition testimony showed that "Todd" was to ride with Golladay to the signing event, and emails to and from France attached the contract for the event. France's false representations that he did not possess those emails and that he

---

[11] Though France said he would produce documents in his "possession or control" (J.A. at 2816), he then implied a definition of "control" that deprived it of any clear meaning by asserting that he would not produce documents in the possession of his own employer – evidently including documents he himself generated – or documents in the possession of any other non-party. Since he indicated an unwillingness to ask his employer or others for access to documents, the implication was that he was only willing to produce documents in his possession, not documents that might be under his control.

had no involvement in the event amount to clear and convincing evidence that fraud occurred.[12] *Cf. Bonar*, 835 F.2d at 1384 (concluding that movant "submitted to the district court clear and convincing evidence of [an expert witness's] perjury" by providing letters and an affidavit contradicting the expert's claimed background).

### B. The Fraud Was Not Discoverable Through Reasonable Diligence

As for Bernstein's second showing – that the fraud was not discoverable through reasonable diligence – France's non-production of responsive documents and false testimony fit the bill. In fact, the fraud occurred directly in response to the reasonable diligence that Bernstein exercised in his discovery attempts leading up to the arbitration.

As already discussed, France promised to produce documents responsive to Bernstein's requests but then represented that no such documents pertaining to the autograph-signing event were in his possession. France reinforced that falsehood with his subsequent denials of having had any involvement in the event. A reasonably diligent litigant in Bernstein's position was entitled to rely upon those

---

[12] The evidence is clear and convincing notwithstanding France's claim that "two e-mails that appear to have been sent to or from an e-mail address for France at CAA do[] not establish that he reviewed or wrote either e-mail." (Answering Br. at 26.) If there were any evidence that other people were sneaking onto France's computer and sending and receiving emails in his name, we would have expected to hear of it.

representations without launching a separate fact-checking investigation. That was similarly the conclusion in *MidAmerican Energy Co. v. International Brotherhood of Electrical Workers Local 499*, 345 F.3d 616, 618-19 (8th Cir. 2003), where the falsity of the prevailing party's statements in a pre-arbitration investigation and at the arbitration hearing went undiscovered until after the award was issued. The losing party later received an anonymous call that the prevailing party may have been lying. *Id.* at 619. Even though the losing party apparently did nothing to second-guess the veracity of the statements that proved to be false, there was no dispute – indeed everyone agreed – "that the potential fraud was not discoverable before or during the arbitration proceedings[.]" *Id.* at 622.

The issue that received much more attention before the District Court here, and has been pressed vigorously before us, is whether Bernstein's failure to seek enforcement of subpoenas directed at non-parties reflected a lack of reasonable diligence that otherwise would have uncovered France's fraud. The District Court thought so, denying Bernstein's motion to vacate primarily on the ground that he should have pressed for enforcement of those subpoenas, notwithstanding his argument on reply that he did not have sufficient time to do so before or between the two days of the arbitration hearing. The Court also denied his subsequent motion for reconsideration, concluding that Bernstein could have earlier raised his argument that pursuing the subpoenas would have been futile in light of the territorial limits on subpoena enforcement imposed by Federal Rule of Civil Procedure 45.[13]

---

[13] Rule 45 states:

23

In focusing on the non-party subpoenas, the District Court turned its attention away from France's unequivocal statements denying he had possession of any documents indicating he was involved in the autograph-signing event, and his further insistence that he was completely uninvolved in the event. Therein is the legal error. Reasonable diligence does not require parties to assume the other side is lying. It piles one unfairness on another to say that Bernstein had to seek enforcement of the subpoenas shortly before an arbitration hearing, just to double-check whether France was being truthful in representing that he did not possess pertinent documents and that he was not involved in organizing the autograph-signing event.

And Bernstein did in fact take substantial measures toward uncovering France's perjury. He requested documents

> A subpoena may command a person to attend a trial, hearing, or deposition only as follows: (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person (i) is a party or a party's officer; or (ii) is commanded to attend a trial and would not incur substantial expense.

Fed. R. Civ. P. 45(c)(1). It also states: "A subpoena may command … production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person[.]" Fed. R. Civ. P. 45(c)(2)(A).

from France, including those related to "the January 21, 2019 appearance and autograph signing by Kenny Golladay that is referenced in the Grievance" (J.A. at 2807-08), and pressed for France to submit to a pre-hearing deposition. When it became clear that France would only produce documents in his personal possession, Bernstein asked the arbitrator to authorize subpoenas directed at CAA Sports and other non-parties. Those subpoenas sought documents that would have exposed France's perjury, including his emails receiving and sending the contract for the signing event. For example, the subpoena directed at CAA Sports requested "[e]ach and every document, or communication from you to any other person, that concerns, relates to, or mentions the January 21, 2019 appearance and autograph signing by Kenny Golladay that is referenced in the Grievance." (J.A. at 705.) While Bernstein served that subpoena in October 2019, CAA Sports failed to voluntarily comply. And in the few weeks between Bernstein's service of the subpoena and the first arbitration hearing, Bernstein deposed France, who falsely testified that he had no involvement in the autograph-signing event.

In view of that fraudulent representation, which France made under oath, Bernstein could have reasonably concluded it was not worthwhile to aggressively pursue non-party discovery, especially considering the cost and burden involved in instituting an action in federal court, as necessary to enforce those subpoenas. That decision and the efforts Bernstein made to that point were appropriate under the circumstances, so Bernstein was not required to pursue judicial enforcement of the subpoenas through an independent federal action in order to satisfy due diligence.

25

While it would, perhaps, have been to Bernstein's credit to more aggressively pursue enforcement of the non-party subpoenas, he only requested those subpoenas because he was trying to bring CAA Sports and others within the scope of his earlier-submitted document requests. Those subpoenas were not looking for documents in France's possession. France had already said, untruthfully, that he would turn over such documents if only he had any. *Cf. Hay Grp., Inc. v. E.B.S. Acquisition Corp.*, 360 F.3d 404, 409 (3d Cir. 2004) (noting the particular burdens of enforcing arbitration subpoenas, which are enforceable only when they command non-parties to physically appear before the arbitrator and to bring documents with them). Bernstein was led to believe that there were no such documents, and, like the losing party in *MidAmerican Energy*, he should not be penalized for accepting his opponent's representations. 345 F.3d at 618-19, 622.[14]

All in all, Bernstein's efforts were reasonable under the specific circumstances of record. It is true that Bernstein did not pursue every possible discovery mechanism, but a litigant's diligence can be legally adequate even if some stones are left unturned. "Reasonable" does not mean "perfect."

## C.     The Fraud Was Material to the Case

Finally, the fraud was material, and obviously so. The concealed evidence proved important facts supporting

---

[14] We therefore need not decide, as the parties dispute vigorously, whether it was legally possible for Bernstein to have the issued subpoenas enforced (or whether, as the District Court thought, Bernstein forfeited such an argument).

Bernstein's theory of the case. "For fraud to be material within the meaning of Section 10(a)(1) of the FAA," Bernstein had to "demonstrate a nexus between the alleged fraud and the decision made by the arbitrator[.]" *Odeon Cap.*, 864 F.3d at 196. The standard is relatively forgiving; he "need not demonstrate that the arbitrator[] would have reached a different result." *Id.*

Bernstein's central allegation in his grievance was that France was behind Golladay's signing event. The arbitrator concluded that Bernstein did not present any evidence in support of that theory. But Bernstein could have, and undoubtedly would have, presented such evidence if not for France's lie that he had no documents reflecting his involvement in the signing event and his further lies about being wholly uninvolved in the event.[15] Viewed in that light, France's fraud is clearly material. *Cf. Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc.*, 335 F.3d 497, 503-04 (6th Cir. 2003) (materiality was met with respect to testimony from an investigator of the workplace altercation that led to the complainant's discharge and was a central factual issue at arbitration).

A complicating factor in this case, however, is that France presented evidence showing that, months before the signing event, Golladay introduced himself – and his mother and Saffold – to France and indicated an interest in hiring him. That evidence was consistent with a conclusion that France

---

[15] This leaves aside the possible subornation of perjury by France in obtaining an affidavit from Silver claiming France knew nothing of the signing event.

neither provided Golladay a thing of value to induce his hiring, in violation of Section 3.B(2) of the NFLPA Regulations, nor initiated communications with Golladay, in violation of Section 3.B(21)(a).[16] France's testimony in that regard was largely corroborated by testimony from Saffold and by affidavits from Golladay and Golladay's mother, although the arbitrator made clear that the affidavits were getting "very, very little" weight relative to the in-hearing testimony. (J.A. at 329.) That version of the events raises the possibility that France's involvement in the autograph-signing event was not the cause of Golladay's decision to change agents.

Still, Bernstein's lack of evidentiary support was front and center in the arbitrator's decision. One of the arbitrator's primary factual findings was that "France had nothing to do with arranging, planning, organizing[,] or influencing in any way the operation of the Signing Event." (J.A. at 274.) That finding was part of the "totality of the evidence" that ultimately formed the basis for the arbitrator's decision. (J.A. at 275.) So, evidence of France's involvement with the signing event clearly would have been material to the arbitrator's decision. But France hid that evidence and then falsely testified that he had no knowledge of or involvement in the signing event. Had Bernstein been able to present the evidence that France should have produced before the arbitration hearing or that Bernstein might have sought more aggressively

---

[16] If Golladay was the one who initiated communications concerning a certain matter, such as the signing event, then the NFLPA Regulations may have permitted France to continue with communications regarding that matter.

from non-parties had France not testified falsely, the arbitrator would have had to weigh the parties' respective stories – both of which would have had some evidentiary support – and could have found in favor of Bernstein. And even if parts of France's story were found to be true – for example, that Golladay introduced himself to France at the charity event – the arbitrator could still have concluded that France's subsequent organization of the signing event was a thing of value intended to induce Golladay to switch agents.

While it is not for us to make those factual findings, it is clear that the arbitrator's fact-finding task would have looked much different had Bernstein possessed the concealed evidence to support the core allegation in his grievance. That is enough for us to see a "nexus between [France's] fraud and the basis for the [arbitrator's] decision." *Int'l Bhd. of Teamsters*, 335 F.3d at 503 (internal quotation marks omitted) (quoting *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Tex.*, 915 F.2d 1017, 1022 (5th Cir. 1990)).

## III.  CONCLUSION

Recognizing the limited circumstances that justify vacating an arbitration award, we are satisfied that one such circumstance is present here: the award was procured by fraud. An honest process is what those who agree to arbitration have a right to expect. Accordingly, we will reverse and remand for entry of an order vacating the arbitration award.